IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STARSTONE SPECIALTY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No.: ) |
| BKS SOLUTIONS, INC. D/B/A EVENT MEDICAL SOLUTIONS F/K/A MATTHEW SCHIPPER INC. D/B/A EVENT MEDICAL SOLUTIONS, and CHRISTINA S. ELIAS, Independent Executor of the Estate of Scott D. Elias, Deceased, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff, StarStone Specialty Insurance Company ("StarStone"), by and through its undersigned counsel, and for its Complaint for Declaratory Judgment against BKS Solutions, Inc. D/B/A Event Medical Solutions F/K/A Matthew Schipper Inc. D/B/A Event Medical Solutions ("EMS") and Christina S. Elias, Independent Executor of the Estate of Scott D. Elias, Deceased, states as follows:

1. This is an action seeking a judicial declaration that StarStone has no duty to defend and indemnify EMS under Healthcare Liability Follow Form Excess Policy No. L89850231AHL issued to EMS for the period of April 20, 2023 to April 20, 2024 (the "StarStone Excess Policy"), with respect to the lawsuit captioned *Christina S. Elias, Independent Executor of the Estate of Scott D. Elias, Deceased v. BKS Solutions, Inc. d/b/a Event Medical Solutions, Inc., et al*, Case No. 2023L006849, pending in the Circuit Court of Cook County, Illinois (the "Underlying Action"). A copy of the StarStone Excess Policy is attached hereto as Exhibit 1.

**PARTIES**

2.  StarStone is an insurance company duly organized and existing under the laws of the State of Delaware with its principal office located in Ohio.

3.  EMS is a corporation duly organized and existing under the laws of the State of Illinois with its principal place of business in Illinois.

4.  Christina S. Elias ("Ms. Elias") is an individual, residing in Cook County, Illinois and is a citizen of the State of Illinois. Ms. Elias is the duly appointed Executor of the Estate of Scott D. Elias. On July 11, 2023, Ms. Elias, as the Independent Executor of the Estate of Scott D. Elias, filed the Underlying Action.

5.  On April 11, 2025, Ms. Elias, as the Independent Executor of the Estate of Scott D. Elias, filed a Fourth Amended Complaint at Law ("FAC"). The FAC filed in the Underlying Action is attached hereto as Exhibit 2.

**JURISDICTION AND VENUE**

6.  This is an action for declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, for the purposes of determining a question of actual controversy between the parties.

7.  This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(1). There is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.  An actual and justiciable controversy exists regarding the parties' respective rights and obligations under the StarStone Excess Policy, and that controversy is ripe for adjudication.

9. Venue is proper in this district under 28 U.S.C. §1391 because the StarStone Excess Policy sued upon herein was made and entered into with EMS in Illinois, and a substantial portion of the events or omissions giving rise to the claim occurred there.

## **THE STARSTONE EXCESS POLICY**

10. StarStone issued the StarStone Excess Policy to EMS for the period of April 20, 2023 to April 20, 2024. See Ex. 1 at SSIC000008.

11. The StarStone Excess Policy was cancelled effective November 1, 2023. Id. at SSIC000025.

12. The StarStone Excess Policy, subject to its own terms conditions, limitations, exclusions, and endorsements, follows form to the **Followed Policy**, which is identified in Item 4.B of the StarStone Excess Policy's Declarations as the Healthcare Liability Policy No. HN049259 (the "Primary Policy"), issued to EMS by National Fire & Marine Insurance Company ("NFMIC") for the period of April 20, 2023 to April 20, 2024. A copy of the Primary Policy is attached hereto as Exhibit 3.

13. The Primary Policy was cancelled effective November 1, 2023. See Ex. 3 at SSIC000142.

14. The StarStone Excess Policy's Insuring Agreement provides:

> The **Insurer** shall pay those sums that the **Insured** becomes legally obligated to pay as **Loss** in excess of the **Underlying Limit** as a result of a covered **Claim**, provided that the **Followed Policy** also applies or would apply but for the exhaustion of the **Underlying Limit**. This Policy, except as stated herein, is subject to all of the terms, conditions, limitations, and exclusions contained in or applicable to the **Followed Policy** as of the inception date of this Policy. In no event shall this Policy grant broader coverage than would be provided by the most restrictive applicable **Underlying Policy**.
>
> See Ex. 1 at SSIC000011.

3

15. The StarStone Excess Policy defines **Followed Policy** to mean the "Governing Excess policy specified in Item 4.a. of the Declarations. If no such Governing Excess policy is specified, then **Followed Policy** shall mean the applicable **Underlying Policy** set forth in Item 4.b. of the Declarations. Id. at SSIC000012.

16. The Primary Policy is the **Followed Policy** because it is the applicable **Underlying Policy** set forth in Item 4.b. of the Declarations. Id. at SSIC000008.

17. The StarStone Excess Policy's contains the following Underlying Insurance Condition:

> 3. If the **Followed Policy** affords coverage on a claims-made basis, then this insurance shall apply on a claims-made basis; provided however, no coverage shall be available under this Policy for **Loss** based upon or arising out of any act, error, omission, or event:
>
>    a. commencing, in whole or in part, before the applicable Retroactive Date set forth in Item 3.c. of the Declarations; or
>
>    b. occurring prior to the **Policy Period** if any **Responsible Insured**, on or before the effective date of the **Policy Period**, knew or could have reasonably foreseen that such act, error, omission or event might reasonably be expected to be the basis of a **Claim**.
>
>    If the **Followed Policy** affords coverage on an occurrence basis, then this Policy shall apply on an occurrence basis.
>
> Id. at SSIC000013.

18. The StarStone Excess Policy defines **Responsible Insured** to mean "any director, officer, managing member or governor (or the foreign or domestic equivalent of such positions) of the **Insured**, or any manager or equivalent level employee in any **Insured's** Risk Management, Insurance or Law Department. Id. at SSIC000012.

4

19. The StarStone Excess Policy's Amended Reporting and Notice Requirements Endorsement, which replaces Paragraph 1 of Section VI. Conditions, B. Reporting and Notice Requirements, in relevant part, provides:

> A. As a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall give written notice to the **Insurer**:
>
>   a. as soon as practicable of any occurrence, offense, **Claim** or suit reasonably expected to involve this Policy; but
>
>   b. when the **Followed Policy** provides coverage on a claims-made basis, in the event of any **Claim**:
>
>     1. brought or maintained as a **Class Action**; or
>
>     2. involving any of the following:
>
>       i. unexpected death;
>
>       ii. birth related injury or death, including but not limited to maternal or fetal death, cerebral palsy, shoulder dystocia or anesthesia related injury;
>
>       iii. brain damage, neurological impairment, paralysis, amputation or loss of limb(s);
>
>       iv. loss of hearing or sight;
>
>       v. severe burns or internal injury; or
>
>       vi. any sentinel event,
>
>   notice must be provided as soon as practicable; but in no event later than 30 days after the end of the **Policy Period**.

Id. at 000016.

## THE PRIMARY POLICY

20. The Primary Policy's applicable Claims-Made and Reported Professional Liability Insuring Agreement provides:

> If "claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

5

a. The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage part, arising from a **health care event** that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

   (1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

   (2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

b. All **claims** and **potential claims** arising out of, or in connection with, a **healthcare event** will be deemed to have been first made on the date the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to the **health care event**, no matter when any subsequent **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to any subsequent **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.

See Ex. 3 at SSIC000092.

21. The Primary Policy defines **health care event** to mean:

    **Health care event** means any **event** in the rendering of, or failure to render, **professional services** that results in injury to a **patient** or to a **resident**. All injuries to a **patient** or to a **resident** arising out of, or in connection with, the same or related acts or omissions, including a series of related acts or omissions, in furnishing **professional services** to a **patient** or to a **resident**, whether by one or more **insureds** or other persons, shall be considered one **health care event**.

Id. at SSIC000073.

22. The Primary Policy defines **potential claim** to mean "an **event** that an **authorized insurer** knows or reasonably should know is likely to result in a **claim**." Id. at SSIC000077.

23. The Primary Policy defines **Event** as follows:

> **Event** means an accident resulting in injury. All injuries arising out of, or in connection with:
>
> 1. The same or related acts or omissions, including a series of related acts or omissions; or
>
> 2. The continuous or repeated exposure to substantially the same harmful conditions;
>
> will be considered one **event**. For the purposes of this definition, all injuries to a mother and fetus (or fetuses) from conception through delivery shall constitute one **event**.

Id. at SSIC000073.

24. The Primary Policy defines **Claim** to mean "an express, written demand upon an **insured** for money or services as compensation for damages, including a suit. As used in this definition, "suit" means a civil proceeding in which damages to which this insurance applies are alleged. Suit also includes an arbitration or other alternative dispute resolution proceeding in which such damages are claimed and to which an **insured** must submit or does submit with the **company's** consent. However, this definition does not apply to coverage provided under the Cyber Liability and Breach Response Coverage Part." Id. at SSIC000072.

25. The Primary Policy defines **professional services** as follows:

> **Professional services** means **treatment**, peer review and utilization management not involving **managed care services**. As used in this definition:
>
> 1. "peer review" means the evaluation of a health care provider's fitness and qualification to provide **treatment** by a professional review board or committee through formally adopted, written procedures for the purposes of granting, determining or revoking clinical staff privileges at a hospital, clinic or other medical facility that is a **named insured**, and

7

    which results in a **claim** or **potential claim** by a **patient** or by a **resident** arising from **treatment**; and

2. "utilization management" means the process of evaluating **treatment** to a **patient** or to a **resident** for its appropriateness or necessity which results in a **claim** or **potential claim** by a **patient** or by a **resident** alleging **loss** arising from **treatment**. In clarification and not in limitation of the foregoing, utilization management will include prospective review of proposed **treatment**, concurrent review of **treatment**, retrospective review of already rendered **treatment**, disease management, **case management**, and the use of predictive modeling to identify individuals or populations for disease management or **case management**.

Id. at SSIC000078.

26. Section V. Conditions, Item P. REPORTING REQUIREMENTS, Paragraph 1. of the Primary Policy provides:

1. The **company's** duty to pay **loss** for any **claim** or **potential claim** otherwise covered under this policy is strictly conditioned upon an **authorized insured's** forwarding, as soon as practicable, notice of every **claim**, **potential claim**, demand, suit, summons, or legal paper an **insured** receives.

Id. at SSIC000089.

## THE UNDERLYING ACTION

27. On July 11, 2023, Ms. Elias, as the Independent Executor of the Estate of Scott D. Elias, filed the Underlying Action against Jam Productions, Ltd and Riviera Entertainment Properties, LLC d/b/a The Riviera Theater. A copy of Plaintiff's Complaint at Law is attached hereto as Exhibit 4.

28. Plaintiff in the Underlying Action alleges that on June 21, 2025, Scott D. Elias ("Decedent") was at Riviera Theater in Chicago, Illinois when he fell and suffered injuries to his cervical spine. Id. at ¶¶ 3, 6.

8

29. Plaintiff in the Underlying Action alleges that Decedent died on July 1, 2023. Id. at ¶ 9.

## EMS' NOTICE TO NFMIC AND ONGOING LITIGATION IN THE UNDERLYING ACTION

30. On July 24, 2023, EMS provided its insurance broker with a copy of the initial complaint filed in the Underlying Action. A copy of an email exchange between EMS and its broker is attached hereto as Exhibit 5.

31. On July 25, 2023, EMS' broker indicated that it would report the Underlying Action to NFMIC. Id.

32. NFMIC acknowledged notice of the potential claim on August 10, 2023. A copy of the NFMIC's acknowledgment letter is attached hereto as Exhibit 6.

33. On February 22, 2024, EMS received a records subpoena in the Underlying Action and sent a copy to its insurance broker. A copy of an email exchange between EMS and its broker and the records subpoena is attached hereto as Exhibit 7.

34. On June 6, 2024, Plaintiff filed an Amended Complaint at Law in the Underlying Action. A copy of the Amended Complaint is attached hereto as Exhibit 8.

35. The Amended Complaint named EMS as a Defendant. Id. at SSIC000164.

36. NFMIC acknowledged notice of the Amended Complaint on July 3, 2024. A copy of the NFMIC's acknowledgment letter is attached hereto as Exhibit 9.

## THE FAC

37. Plaintiff filed the FAC on April 11, 2025. See Ex. 2 at SSIC000029.

38. The FAC alleges that on June 21, 2023, EMS provided emergency medical services for a music concert at the Riviera Theater. Id. at ¶ 3.

9

39. The FAC alleges that on June 21, 2023, Scott Elias fell and suffered injuries to his cervical spine. Id. at ¶ 4.

40. The FAC alleges at the aforesaid time and place that employees and/or agents of EMS attended to the Decedent. Id. at ¶ 5

41. The FAC alleges that at the aforesaid time and place the Decedent was exhibiting signs and symptoms of a cervical spinal injury. Id. at ¶ 6.

42. The FAC alleges that Decedent died on July 1, 2023. Id. at ¶ 18.

43. The FAC alleges statutory causes of action pursuant to the Illinois Wrongful Death Act, 740 ILCS § 180/1, *et seq.* (Counts I, III, V, VII, IX, and XI); the Illinois Survival Statute, 755 ILCS § 5/27-6, *et seq.* (Counts II, IV, VI, VIII, X, and XII); and the Illinois Premises Liability Act § 740 ILCS 130/1, *et seq.* (Counts V, VI, IX, and X). Id.

44. As a result, Plaintiff in the Underlying Action demands judgment against EMS for a sum in excess of $30,000 on each Count and costs.

## NOTICE OF THE UNDERLYING ACTION TO STARSTONE AND STARSTONE'S COVERAGE POSITION

45. On April 16, 2025, Defendant EMS' insurance broker provided notice of the FAC to StarStone. A copy of StarStone's acknowledgement letter is attached hereto as Exhibit 10.

46. On April 18, 2025, StarStone acknowledged notice of the Underlying Action. Id.

47. On June 2, 2025, StarStone issued a reservation of rights letter to EMS. A copy of StarStone's reservation of rights letter is attached hereto as Exhibit 11.

48. StarStone reserved its rights to disclaim coverage for the Underlying Action based on EMS' failure to satisfy conditions precedent to coverage pursuant to the StarStone Excess Policy's Amended Reporting and Notice Requirements Endorsement. Id. at SSIC000198.

## COUNT I

49. StarStone hereby adopts by reference the allegations contained in paragraphs 1 through 48 of this Complaint as if fully set forth herein.

50. The StarStone Excess Policy provides that if the Followed Policy affords coverage on a Claims-Made basis, then the StarStone Excess Policy provides coverage on a Claims-Made basis. See Ex. 1 at SSIC000013.

51. The StarStone Excess Policy provides that the term Claim "shall have the meaning as assigned to that term or the equivalent term in the Followed Policy." Id. at SSIC000012.

52. The Primary Policy defines to mean Claim to mean, in relevant part, "an express, written demand upon an insured for money or services as compensation for damages, including a suit. As used in this definition, "suit" means a civil proceeding in which damages to which this insurance applies are alleged." See Ex. 3 at SSIC000072.

53. The Underlying Action was initiated on July 11, 2023. See Ex. 5.

54. The Underlying Action did not name EMS as a Defendant. Id.

55. Therefore, the initial complaint filed in the Underlying Action did not constitute a Claim as that term is defined by the Primary Policy and StarStone Excess Policy.

56. The Amended Complaint was filed on June 6, 2024. See Ex. 8.

57. The Amended Complaint named EMS as a Defendant. Id.

58. Therefore, the Amended Complaint filed in the Underlying Action constituted a Claim as that term is by the Primary Policy and StarStone Excess Policy.

59. The Primary Policy only provides coverage for Claims first made against EMS during the Primary Policy's Policy Period. See Ex. 3 at SSIC000092.

60. The StarStone Excess Policy follows form to the Primary Policy and provides coverage on a Claims-Made basis. See Ex. 1 at SSIC000011; SSIC000013.

61. The Underlying Action constitutes a Claim first made on June 6, 2024 because that is when EMS was named as a Defendant in the Underlying Action.

62. The Primary Policy and StarStone Excess Policy were cancelled effective November 1, 2023. See Ex. 1 at SSIC000025; Ex. 3 at SSIC0000142.

63. Therefore, the Underlying Action does not constitute a Claim first made during either the Primary Policy's or StarStone Excess Policy's Policy Period, as the term Claim, is defined in those Policies.

64. Consequently, StarStone is under no obligation to defend and/or indemnify EMS in connection the causes of action asserted against EMS in the Underlying Action pursuant to the terms, conditions, provisions, and exclusions of the StarStone Excess Policy.

65. An actual, present, and justiciable controversy exists concerning whether the Underlying Action constitutes a Claim made during the StarStone Excess Policy's Policy Period.

66. StarStone requests that the Court declare that StarStone does not have a duty to defend and/or indemnify EMS in connection with the Underlying Action because the Underlying Action does not constitute a Claim first made during the StarStone Excess Policy Period.

## COUNT II - PLED IN THE ALTERNATIVE

67. StarStone hereby adopts by reference the allegations contained in paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68. In the alternative, the Underlying Action constitutes a Claim made during the StarStone Excess Policy's Policy Period.

69. Section VI.B.1.b. provides that as a condition precedent to StarStone's obligations under the StarStone Excess Policy, when the Followed Policy provides coverage on a Claims-Made basis, in the event of any Claim involving unexpected death or any sentinel event, notice must be provided as soon as practicable; but in no event later than 30 days after the end of the Policy Period. See Ex. 1 at SSIC000016.

70. The Followed Policy provides coverage on a Claims-Made basis. See Ex. 3 at SSIC000092.

71. On July 24, 2023, EMS received a copy of the initial complaint filed in the Underlying Action. See Ex. 5.

72. At that time, EMS knew or reasonably should have known that the Underlying Action involved an unexpected death and sentinel event.

73. EMS' insurance broker reported the Underlying Action to NFMIC. See Ex. 6.

74. On August 10, 2023, NFMIC acknowledged receipt of the Underlying Action. Id.

75. On June 6, 2024, EMS was added as a direct defendant in the Underlying Action. See Ex. 8.

76. On July 3, 2024, NFMIC acknowledged notice of the Amended Complaint that added EMS as a direct defendant. See Ex. 9.

77. At that time, NFMIC noted that the Claim fell within Primary Policy's Policy Period. Id.

78. As such, the Underlying Action constituted a Claim made on or about August 10, 2023.

13

79. Accordingly, EMS was required to provide StarStone with notice of the Underlying Action as soon as practicable; but in no event later than 30 days after the end of the Policy Period, which was December 1, 2023.

80. EMS reported the FAC to StarStone:

    a. 665 days after Decedent fell at a concert in which EMS was providing emergency medical services;

    b. 655 days after Decedent died;

    c. 632 days after EMS knew or reasonably should have known that Decedent died after suffering a fall at a concert in which EMS was providing emergency medical services;

    d. 615 days after EMS reported and NFMIC acknowledged receipt of the Underlying Action;

    e. 532 days after the termination of the StarStone Excess Policy;

    f. 502 days after that latest date EMS could have reported a Claim involving an unexpected death or sentinel event;

    g. 419 days after EMS received a records subpoena in the Underlying Action; and

    h. 314 days after EMS was added to the Underlying Action as a direct defendant.

81. EMS failed to satisfy a condition precedent to the obligations of StarStone under the StarStone Excess Policy by not giving written notice to StarStone, when the Followed Policy provides coverage on a Claims-Made basis, and in the event of a Claim involving an unexpected death and sentinel event, as soon as practicable; but in no event later than 30 days after the end of the Policy Period, which was December 1, 2023.

14

82. Consequently, StarStone is under no obligation to defend and/or indemnify EMS in connection the causes of action asserted against EMS in the Underlying Action pursuant to the terms, conditions, provisions, and exclusions of the StarStone Excess Policy.

83. An actual, present, and justiciable controversy exists concerning whether EMS reported a Claim involving an unexpected death and sentinel event as soon as practicable; but in no event after December 1, 2023.

84. StarStone requests that the Court declare that StarStone does not have a duty to defend and/or indemnify EMS in connection with the Underlying Action EMS failed to satisfy a condition precedent to the obligations of StarStone under the StarStone Excess Policy by not giving written notice to StarStone of a Claim involving an unexpected death and sentinel event as soon as practicable; but in no event after December 1, 2023.

## COUNT III

85. StarStone hereby adopts by reference the allegations contained in paragraphs 1 through 84 of this Complaint as if fully set forth herein.

86. Section VI.B.1.a. provides that as a condition precedent to StarStone's obligations under the StarStone Excess Policy, EMS shall give written notice to StarStone as soon as practicable of any occurrence, offence, Claim or suit reasonably expected to involve the StarStone Excess Policy.

87. On June 21, 2023, Decedent allegedly fell and suffered a cervical fracture at C4 during a concert in which EMS was providing emergency medical services. See Ex. 4 at ¶ 6 (SSIC000144); Ex. 2 at ¶ 3 (SSIC000030).

88. On July 1, 2023, Decedent allegedly died as a result of his fall. See Ex. 4 at ¶ 9 (SSIC000144).

89. On July 24, 2023, EMS received a copy of the initial complaint filed in the Underlying Action. See Ex. 5.

90. At that time, EMS knew or reasonably should have known that the Underlying Action involved an unexpected death and that EMS provided emergency medical services to Decedent.

91. On August 10, 2023, NFMIC acknowledged receipt of the a Potential Claim/Claim "based on professional services rendered on or about" June 21, 2023. See Ex. 6.

92. On February 22, 2024, EMS received a records subpoena. See Ex. 7.

93. On June 6, 2024, EMS was added to the Underlying Action as a direct defendant. See Ex. 8.

94. NFMIC acknowledged receipt of the Amended Complaint filed in the Underlying Action on July 3, 2024. See Ex. 9.

95. The FAC was filed on April 11, 2025. See Ex. 2.

96. EMS' insurance broker first reported the FAC to StarStone on April 16, 2025. See Ex. 10.

97. EMS reported the FAC to StarStone:

   a. 665 days after Decedent fell at a concert in which EMS was providing emergency medical services;

   b. 655 days after Decedent died;

   c. 632 days after EMS knew or reasonably should have known that Decedent died after suffering a fall at a concert in which EMS was providing emergency medical services;

16

    d.   615 days after EMS reported and NFMIC acknowledged receipt of the Underlying Action;

    e.   532 days after the termination of the StarStone Excess Policy;

    f.   419 days after EMS received a records subpoena in the Underlying Action; and

    g.   314 days after EMS was added to the Underlying Action as a direct defendant.

98. EMS failed to satisfy a condition precedent to the obligations of StarStone under the StarStone Excess Policy by not giving written notice to StarStone of any occurrence, offence, Claim or suit reasonably expected to involve the StarStone Excess Policy as soon as practicable.

99. Consequently, StarStone is under no obligation to defend and/or indemnify EMS in connection the causes of action asserted against EMS in the Underlying Action pursuant to the terms, conditions, provisions, and exclusions of the StarStone Excess Policy.

100. An actual, present, and justiciable controversy exists concerning whether EMS reported an occurrence, offence, Claim or suit reasonably expected to involve the StarStone Excess Policy as soon as practicable.

101. StarStone requests that the Court declare that StarStone does not have a duty to defend and/or indemnify EMS in connection with the Underlying Action because EMS failed to satisfy a condition precedent to the obligations of StarStone under the StarStone Excess Policy by not giving written notice to StarStone of an occurrence, offence, Claim or suit reasonably expected to involve the StarStone Excess Policy as soon as practicable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, StarStone Specialty Insurance Company, prays that this Court enter an Order:

1.	declaring that StarStone does not have a duty to defend and/or indemnify EMS in connection with the Underlying Action because the Underlying Action does not constitute a Claim first made during the StarStone Excess Policy Period;

2.	declaring that StarStone does not have a duty to defend and/or indemnify EMS in connection with the Underlying Action EMS failed to satisfy a condition precedent to the obligations of StarStone under the StarStone Excess Policy by not giving written notice to StarStone of a Claim involving an unexpected death and sentinel event as soon as practicable; but in no event after December 1, 2023;

3.	declaring that StarStone does not have a duty to defend and/or indemnify EMS in connection with the Underlying Action because EMS failed to satisfy a condition precedent to the obligations of StarStone under the StarStone Excess Policy by not giving written notice to StarStone of an occurrence, offence, Claim or suit reasonably expected to involve the StarStone Excess Policy as soon as practicable;

4.	awarding StarStone its costs, and expenses together with pre- and post-judgment interest to the greatest extent allowed by law; and

5.	awarding StarStone all other relief that the Court deems just and equitable.

Dated: October 8, 2025

Respectfully submitted,

STARSTONE SPECIALTY INSURANCE COMPANY

By: */s/ Michael J. Weiss*
    One of Its Attorneys

Michael J. Weiss (ARDC #6321701)
COZEN O'CONNOR
123 North Wacker Drive, Suite 1800
Chicago, IL 60606
(312) 474-7977 (telephone)
(312) 382-8910 (facsimile)
mjweiss@cozen.com

Gary L. Gassman
COZEN O'CONNOR
123 North Wacker Drive, Suite 1800
Chicago, IL 60606
(312) 474-7994 (telephone)
(312) 706-9756 (facsimile)
ggassman@cozen.com