**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STARSTONE SPECIALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:2025cv12314 |
| | ) | |
| BKS SOLUTIONS, INC. D/B/A EVENT | ) | Honorable Judge Manish A Shah |
| MEDICAL SOLUTIONS F/K/A MATTHEW | ) | |
| SCHIPPER INC. D/B/A EVENT MEDICAL | ) | |
| SOLUTIONS, and CHRISTINA S. ELIAS, | ) | |
| Independent Executor of the Estate of Scott D. | ) | |
| Elias, Deceased, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT EMS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR DECLARATORY JUDGMENT

Defendant, BKS Solutions, Inc. d/b/a Event Medical Solutions f/k/a Matthew Schipper Inc. d/b/a Event Medical Solutions (hereinafter "EMS") by and through its attorneys, Charles Franklin, Craig Capilla, and Alexandra Letto of Franklin, Greenswag, Channon & Capilla, LLC, respectfully moves the Court to dismiss Plaintiff StarStone Specialty Insurance Company Complaint for Declaratory Judgment pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), for the following reasons:

## INTRODUCTION

This action arises from a declaratory judgment complaint filed by Plaintiff StarStone Specialty Insurance Company ("StarStone") against Defendant BKS Solutions, Inc. d/b/a Event Medical Solutions f/k/a Matthew Schipper, Inc. ("EMS"). StarStone seeks a declaration that it owes no duty to defend or indemnify EMS in a personal injury and wrongful death action pending in the Circuit Court of Cook County, Illinois, Case No. 23 L 6849 (the "Underlying

1

Action" or the "Elias Action"), filed by Christina S. Elias against EMS and other defendants. (Compl. ¶ 1).

StarStone is an excess insurance carrier whose policy follows form and applies only upon exhaustion of EMS's primary insurance coverage. The Underlying Action was mediated on October 22, 2025, and settled at that mediation. The Underlying Action against EMS was dismissed with prejudice on December 11, 2025. (Exhibit A).

By letter dated April 18, 2025, StarStone acknowledged receipt of notice of loss for the Elias Action and reserved its rights. StarStone thereafter issued coverage position and reservation of rights letters through its counsel, Cozen O'Connor, including a letter dated June 2, 2025, which was superseded by a subsequent letter dated October 8, 2025. (See Exhibits B and C.) Notably, on October 8, 2025, the same day StarStone filed the present declaratory judgment action (Compl.), StarStone's counsel expressly stated that "the StarStone Excess Policy is NOT potentially implicated by the [Elias] Lawsuit," while simultaneously advising that, "[n]otwithstanding StarStone's coverage position, StarStone will attend the October 22, 2025, mediation in good faith." (See Exhibit C) (emphasis added). In fact, both a StarStone claims representative, Travis Warriner, and counsel from Cozen O'Connor attended the mediation.

As stated above, the Underlying Action settled at mediation. Pursuant to the settlement, and in exchange for EMS being dismissed with prejudice, EMS's primary insurer agreed to pay an amount, exhausting the primary policy, and StarStone agreed to contribute an additional amount toward the settlement. The total amount of the settlement is confidential. Despite having voluntarily participated in the mediation and having voluntarily contributed to the settlement, StarStone now refuses to dismiss its declaratory judgment complaint. (Compl.). Instead, StarStone appears to seek reimbursement or indemnification from EMS for the payment it chose

to voluntarily make in connection with the settlement of the Elias Action, a settlement reached ostensibly on EMS's behalf.

At no time did StarStone or its counsel advise EMS that its voluntary payment was conditional, subject to reimbursement from EMS, or made under any reservation of a right to seek repayment from EMS. Nor was EMS informed that StarStone or Cozen O'Connor intended to pursue EMS for recovery of settlement funds paid by StarStone. *See* Affidavit of Karl Kuester (Exhibit D). To the contrary, StarStone has repeatedly maintained, both before the mediation and in its Complaint, that its excess policy was not implicated by the Elias Action.

StarStone's current posture is irreconcilable with its mediation participation and conduct. Having voluntarily participated in the defense and settlement of the Underlying Action, and having voluntarily funded a portion of the settlement without reservation or condition, StarStone now seeks indemnification for a payment voluntarily made without basis. StarStone's lawsuit is moot as the Elias Action has been dismissed with prejudice and no longer a need to defend EMS. StarStone's refusal to dismiss this action raises fundamental questions, including: (1) if its voluntary payment was not made on EMS's behalf, on whose behalf was it made; and (2) whether the purported protection afforded by StarStone's excess policy was, in fact, illusory or made its purported coverage a nullity.

## **LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. *Bongiglio v. Citifinancial Servicing, LLC,* 2015 U.S. Dist. LEXIS 128215, **7-8 (ND Ill. 2015). The party asserting jurisdiction has the burden of proof. *Id.* at *8. The standard of review for a Rule 12(b)(1) motion to dismiss depends on the purpose of the motion. *Apex Digital, Inc. v. Sears, Roeback & Co.,* 572 F.3d 440, 443-444 (7th Cir. 2009). If a defendant

challenges the sufficiency of the allegations regarding subject-matter jurisdiction (a facial challenge), the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Id.* If, however, the defendant denies or controverts the truth of the jurisdictional allegations (factual challenge), the Court may look beyond the pleadings and view any competent proof submitted by the parties to determine if the plaintiff has established jurisdiction by a preponderance of the evidence. *Id.*

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court is authorized to dismiss a case "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) tests the sufficiency of the complaint, rather than the merits of the case. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint must provide "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The factual allegations in the complaint must raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Services., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007). In other words, the pleading must allege facts that plausibly suggest the claim asserted. *Id.*

## **ARGUMENT**

### I.    **The Plaintiff's Complaint Must be Dismissed Because the Claims are Moot.**

Article III of the United States Constitution limits federal court jurisdiction to actual, ongoing cases or controversies. Although Article III requires only a probabilistic injury, "this doesn't mean that any probability, however slight, of injury is enough to permit a suit to be maintained in federal court." *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 681 (7th

Cir. 1992). When the dispute between the parties "no longer rages," the case becomes moot, and the court loses subject-matter jurisdiction. *Evers v. Astrue,* 536 F.3d 651, 662 (7th Cir. 2008).

In the context of declaratory judgment actions, an essential requirement is the existence of an actual controversy between the parties. *Grinnell Select Ins. Co. v. Cook*, 2009 U.S. Dist. LEXIS 31645, *6, 2009 WL 1024587. Where the alleged controversy depends on an insurer's potential future obligation arising from an underlying lawsuit, dismissal of the underlying action renders any dispute over the duty to defend or indemnify hypothetical and nonjusticiable. *Id.* Federal courts lack jurisdiction to issue advisory opinions concerning obligations that may never arise.

The Seventh Circuit and courts in this District have repeatedly held that where an underlying action has been dismissed, the possibility of future injury is too remote to sustain Article III jurisdiction. In *National Union Fire Insurance Co. of Pittsburgh, Pa. v. Continental Illinois Corp.,* the court held that "[t]he mere possibility that proceedings might be commenced against an insured regarding an act of the insured's as to which the insurer might contest coverage is not sufficient to create a controversy within the meaning of either the Declaratory Judgment Act or Article III of the Constitution." 113 F.R.D. 637, 640-41 (N.D. Ill. Jan.12, 1987). Similarly, in *Grinnell Select*, the court concluded that even where an underlying action had been dismissed *without* prejudice, the probability of future injury was insufficient to support jurisdiction, rendering the insurer's declaratory judgment claim regarding its duty to defend moot. *Grinnell Select Ins. Co.*, 2009 U.S. Dist. LEXIS 31645, *6-7. These cases make clear that once an underlying lawsuit has been resolved, a declaratory judgment action concerning coverage obligations tied to that lawsuit no longer presents an actual controversy and are moot.

Applying these principles here, StarStone's declaratory judgment action is moot and seeks an impermissible advisory opinion. The sole underlying action identified in the Complaint, the Elias Action, has been dismissed. The Elias Action was mediated on October 22, 2025; a settlement was reached; a motion for good-faith settlement was filed on October 28, 2025; and the Circuit Court of Cook County entered an order on December 11, 2025, dismissing EMS with prejudice pursuant to the settlement. Because EMS has been dismissed with prejudice, there is no pending claim to defend and no legally cognizable possibility that EMS will become obligated to pay damages in the underlying action. Thus, there is no actual controversy present and StarStone's claims are moot.

Under these circumstances, StarStone no longer has a legally cognizable interest in the relief it seeks, and this Court lacks subject-matter jurisdiction to proceed. Accordingly, StarStone's Complaint must be dismissed as moot pursuant to Rule 12(b)(1).

## II.    StarStone's Claims are Barred Because it Acted as a Volunteer and Waived its Coverage Defenses.

Under the voluntary payment doctrine, money voluntarily paid under a claim of right, with full knowledge of the facts, cannot be recovered unless the payment was made under fraud, duress, or mistake of fact. *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 667 (7th Cir. 2001); *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). The doctrine applies only where the payment was made with full knowledge of the relevant facts. *Pittsfield Dev., LLC v. Travelers Indem. Co.*, 542 F. Supp. 3d 791, 800 (N.D. Ill. 2021).

As the Illinois Supreme Court has explained, "in the absence of fraud, misrepresentation, or mistake of fact money voluntarily paid under a claim of right to the payment, with full knowledge of the facts by the person making the payment, cannot be recovered unless the payment was made under circumstances amounting to compulsion." *King v. First Capital Fin.*

6

*Servs. Corp.,* 215 Ill. 2d 1, 828 N.E.2d 1155, 2005 Ill. LEXIS 623, 293 Ill. Dec. 657 citing

*Illinois Graphics Co. v. Nickum,* 159 Ill. 2d 469, 639 N.E.2d 1282, 1994 Ill. LEXIS 101, 203 Ill.

Dec. 463.

*Pittsfield* illustrated the narrow circumstances in which the voluntary payment doctrine

does not bar recovery. 542 F. Supp. 3d 791, 800 (N.D. Ill. 2021). There, the insurer made

multiple payments before learning that the insured had submitted a fraudulent, non-existent bid.

*Id*. at 801-801. It wasn't until discovery started, that the insurer learned of the fraud, and the

court held the doctrine inapplicable because the insurer lacked full knowledge of the facts at the

time of payment and plausibly alleged fraud. *Id.* Therefore, the court emphasized that the

doctrine applies only when the payor had full knowledge of the facts at the time of payment and

was not misled by fraud or mistake. *Id.* at 800-803. Thus, *Pittsfield* does not weaken the

voluntary payment doctrine, it reinforces it. The decision confirms that absent fraud,

misrepresentation, or a mistake of fact unknown at the time of payment, voluntary payments are

unrecoverable as a matter of law.

StarStone's own pleadings and incorporated documents and participation in the mediation

establish that it paid the Settlement Amount with full knowledge of all material facts and without

fraud, mistake of fact, or compulsion. Unlike the insurer in *Pittsfield,* StarStone can not allege

that it learned new facts after payment, uncovered falsified information, or discovered that it had

been misled. To the contrary, before the mediation occurred, StarStone was given all information

regarding the claim and issued a written coverage position expressly stating that its excess policy

was "not potentially implicated" by the underlying action. (Exhibit C). StarStone therefore

entered the mediation with a fully formed understanding of the facts of the claim, the procedural

posture of the case, and its own asserted lack of contractual obligation.

StarStone made an affirmative decision to attend the mediation with its coverage counsel and to participate in settlement discussions concerning EMS's exposure. It is common sense that good faith participation in mediation necessarily involves evaluation of liability risk, damages exposure, and settlement value. StarStone cannot allege that any facts were unknown, concealed, or misrepresented at the time of payment. Nor does StarStone allege that EMS provided false information, submitted a fraudulent claim, or engaged in any conduct comparable to the post-payment discovery of fraud that defeated application of the voluntary payment doctrine in *Pittsfield.*

Equally important, StarStone cannot allege circumstances amounting to compulsion. Given their coverage position, StarStone cannot allege it was legally required to contribute to the settlement, ordered by a court to do so, or faced with any immediate legal consequence that deprived it of a meaningful choice. At most, the October 8th coverage letter (Exhibit C) reflects that StarStone made a strategic decision to contribute to settlement in order to resolve the underlying litigation. Illinois law is clear that litigation pressure, risk assessment, or a desire to control outcomes does not constitute compulsion for purposes of the voluntary payment doctrine. *King,* 215 Ill. 2d 1 (2005).

StarStone's conduct at the mediation further confirms the voluntary nature of the payment. StarStone did not condition payment on reimbursement, did not reserve a right of recoupment, did not obtain authorization from EMS to pay on a conditional basis, and did not advise EMS that the payment was being made subject to later dispute. (See Affidavit of Karl Kuester). Having chosen to pay unconditionally and with full knowledge, StarStone cannot now recast that decision as involuntary simply because it may regret its decision, akin to buyer's remorse.

8

Thus, the present case is distinguishable from *Pittsfield.* There, the insurer paid before discovering fraud and lacked the opportunity to withhold payment. *Id.* Here, StarStone paid after affirmatively denying coverage, with complete knowledge of facts. The voluntary payment doctrine squarely bars StarStone's attempt to recover the Settlement Amount as a matter of law and dismissal under 12(b)(6) is required.

### III. StarStone Waived Any Right to Deny Coverage or Seek Relief Inconsistent with Its Mediation Conduct.

"The definition of the common law concept of waiver is well-established in the Seventh Circuit. Waiver is a voluntary and intentional relinquishment of a known right." *Primax Recoveries v. Sevilla,* 2002 U.S. Dist. LEXIS 443, 27 Employee Benefits Cas. (BNA) 1660 citing *Loyola Univ. of Chicago v. Humana Ins Co.*, 996 F.2d 895, 901 (7th Cir. 1993). Waiver arises from a unilateral, affirmative act by the insurer and is established where the insurer's words or conduct are inconsistent with the intent to rely on the provisions of the policy. *Loyola Univ. of Chicago,* 996 F.2d 899 citing *Western Casualty & Surety Co. v. Brochu,* 105 Ill. 2d 486, 475 N.E.2d 872, 878, 86 Ill. Dec. 493 (1985).

The party asserting bears the burden of proof, and the evidence must be clear, precise, and unequivocal. *Id.* citing *Buchalo v. Country Mutual Ins. Co.,* 83 Ill. App. 3d 1040, 1046, 404 N.E.2d 473, 478, 39 Ill. Dec. 89 (1st Dist. 1980). Importantly, courts distinguish waiver from estoppel: waiver focuses on the insurer's intentional conduct inconsistent with enforcement of policy rights, while estoppel requires misrepresentation and detrimental reliance. *Id.* at 902-903. At the same time, courts recognize that not every act or statement constitutes waiver. The omission of a defense from correspondence, or conduct consistent with continued enforcement of policy conditions, does not amount to waiver. *Id.* citing *Farley v. Benefit Trust Life Ins. Co.,* 979 F.2d 653, 659 (8th Cir. 1992).

9

In *Loyola,* the Seventh Circuit rejected waiver where the insurer's conduct, viewed in its entirety, remained consistent with enforcement of policy conditions. *Id.* Although the insured argued that certain statements suggested coverage might later be determined, the court emphasized that waiver requires conduct that is "clear, precise, and unequivocal" and inconsistent with reliance on the policy. *Id.* at 902. Because the insurer repeatedly reaffirmed the relevant coverage condition and never abandoned its position, no waiver occurred. Notably, the court focused not on isolated statements, but on whether the insurer's overall conduct demonstrated an intent to relinquish its rights. Where the insurer continued to insist on compliance with policy conditions and did not assume a role inconsistent with denial of coverage, waiver could not be established as a matter of law. *Id.*

Unlike the insurer in *Loyola,* by participation in the mediation and contribution to the settlement, StarStone engaged in affirmative conduct that is fundamentally inconsistent with its denial of coverage. StarStone expressly stated in writing that its excess policy was "not potentially implicated" by the underlying action. Notwithstanding that denial, StarStone, through its counsel bringing the instant Complaint, affirmatively elected to participate in the October 22, 2025, mediation, a core defense function involving evaluation of liability, settlement posture, and risk exposure. StarStone then voluntarily contributed an amount to help fund the settlement that resulted in EMS's dismissal with prejudice. This conduct goes far beyond the mere omission of a defense, or ambiguous statements addressed in *Loyola.* Participation in medication and funding a settlement are not passive or equivocal acts; they are affirmative, unilateral actions that are inconsistent with an intent to stand on a denial of coverage. Having chosen to insert itself, on behalf of EMS, in the mediation, StarStone cannot plausibly maintain that it intended to preserve the right to deny coverage or seek relief inconsistent with that conduct.

10

Moreover, StarStone's actions were not accompanied by any reservation that the settlement contribution was conditional, subject to reimbursement, or adverse to EMS's interests. No authorization was sought from EMS, and no agreement was obtained requiring EMS to indemnify StarStone. Viewed objectively, StarStone's conduct communicated assent to the settlement as final and unconditional. Under Illinois law, such conduct constitutes a voluntary and intentional relinquishment of any right to deny coverage or seek contrary relief. *Western Casualty & Surety Co,* 105 Ill. 2d 486, 475 N.E.2d 872, 878, 86 Ill. Dec. 493 (1985).

Accordingly, applying the waiver principles articulated in *Loyola, Buchalo,* and *Farley,* StarStone's own pleadings and incorporated documents establish waiver as a matter of law. StarStone's affirmative conduct is inconsistent with its asserted coverage position, the Complaint fails to state a claim upon which relief can be granted and must be dismissed under Rule 12(b)(6).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Complaint fails as a matter of law. The Underlying Action identified in the Complaint and against EMS has been fully resolved. And EMS has been dismissed with prejudice, rendering Plaintiff's request for declaratory relief moot and nonjusticiable. In addition, Plaintiff's claims are both barred by the voluntary payment doctrine and waiver, as Plaintiff knowingly and voluntarily and willingly participated in mediation and funded the settlement after denying any coverage obligation. Because Plaintiff seeks and relief inconsistent with its own voluntary conduct, the Complaint must be dismissed in its entirety.

WHEREFORE, Defendants, BKS Solutions, Inc. d/b/a Event Medical Solutions f/k/a Matthew Schipper Inc. d/b/a Event Medical Solutions, respectfully requests that this Court

dismiss Plaintiff's Complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6) and

12(b)(1) and other and further relief this Court deems just and proper.

Respectfully submitted,

/s/ Alexandra Letto
One of Defendant's Attorneys

Charles Franklin
Craig Capilla
Alexandra Letto (ARDC # 635330)
FRANKLIN, GREENSWAG, CHANNON & CAPILLA, LLC
181 Waukegan Rd., St. 205
Northfield, IL 60093-2700
Phone: (847) 701-2250
Fax:    (847) 501 5390
cfranklin@fgcclaw.com
Ccapilla@fgcclaw.com
Aletto@fgcclaw.com
Law Firm No.: 65401

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on this 5th day of January 2026, she

electronically filed via ECF the foregoing to the following:

Michael J. Weiss
COZEN O'CONNOR
123 North Wacker Drive, Suite 1800
Chicago, IL 60606
Tel: (312) 474-7977
Facsimile: (312) 382-8910
mjweiss@cozen.com
*Counsel for Plaintiff*

Gary L. Gassman
COZEN O'CONNOR
123 North Wacker Drive, Suite 1800
Chicago, IL 60606
Tel: (312) 474-7977
Facsimile: (312) 382-8910
ggassman@cozen.com
*Counsel for Plaintiff*

/s/ Alexandra Letto
Alexandra Letto
Franklin, Greenswag, Channon & Capilla, LLC
181 Waukegan Road, Suite 205
Northfield, IL 60093
Phone: (847) 701-2250
Fax: (847) 501-5390
aletto@fgcclaw.com

Date: January 5, 2026

# EXHIBIT A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

CHRISTINA S. ELIAS, Independent Executor of ）
the Estate of SCOTT D. ELIAS, Deceased, ）
                            ）
            Plaintiff, ）
                            ）
vs.                            ）       No. 2023L006849
                            ）
BKS SOLUTIONS, INC. d/b/a EVENT MEDICAL ）
SOLUTIONS, INC., an Illinois corporation; CITY ）
OF CHICAGO, a municipal corporation; JAM ）
PRODUCTIONS LLC, an Illinois limited liability ）
company; and RIVIERA ENTERTAINMENT ）
PROPERTIES, LLC d/b/a THE RIVIERA ）
THEATER, an Illinois limited liability company, ）
                            ）
            Defendants, ）
                            ）
CITY OF CHICAGO,                 ）
                            ）
        Defendant/Third Party Plaintiff, ）
                            ）
v.                                ）
                            ）
ANDY FRAIN SERVICES, INC.,      ）
                            ）
         Third Pary Defendant. ）

## DISMISSAL ORDER

This matter coming to be heard on Defendant, BKS SOLUTIONS, INC. d/b/a EVENT

MEDICAL SOLUTIONS, INC.'s Motion for Finding of Good Faith Settlement and Dismissal

with Prejudice, due notice having been given, and the Court duly advised of the premises;

IT IS HEREBY ORDERED:

     1.     The Motion for Finding of Good Faith Settlement is Granted over Defendant, City *1362*
            of Chicago's objection;

     2.     The settlement entered into between Plaintiff, CHRISTINA S. ELIAS, Independent
            Executor of the Estate of SCOTT D. ELIAS, Deceased, and Defendant, BKS
            SOLUTIONS, INC. d/b/a EVENT MEDICAL SOLUTIONS, INC., was made in
            good faith pursuant to the Illinois Joint Tortfeasor Contribution Act, 740 ILCS

100/1, *et seq.* and extinguishes any and all third party contribution claims made or which could be made;

3.   Defendant, BKS SOLUTIONS, INC. d/b/a EVENT MEDICAL SOLUTIONS, *4224* INC., is dismissed with prejudice and without costs pursuant to settlement in the amount of ▆▆▆▆▆▆;

4.   Pursuant to Supreme Court Rule 304(a), there exists no just reason to delay the enforcement of, or appeal from, this order;

5.   This Court shall retain jurisdiction as to settling Defendant to enter any further *4361* orders necessary to effectuate this settlement, allocation, and distribution; to enforce the terms of the settlement; and adjudicate any purported liens or subrogation claims; and

6.   This matter shall remain pending against all other Defendants.

```
ENTERED                    Date
Judge Moira Johnson-1836

DEC 11 2025

MARIYANA T. SPYROPOULOS
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
```

M 1836

Judge's No.

ORDER PREPARED BY:
Jack T. Moore (jmoore@sbh-law.com)
SMITH BLAKE HILL LLC
20 North Clark Street, Suite 1700
Chicago, IL 60602
(312) 471-8080
Firm ID: 59724

Associate Judge Moira S. Johnson

DEC 11 2025

Circuit Court - 1836

# EXHIBIT B



June 2, 2025

Gary L. Gassman

Direct Phone      312-474-7994
Direct Fax      312-706-9756
ggassman@cozen.com

***VIA EMAIL, US MAIL & CERTIFIED MAIL –***
***RETURN RECEIPT REQUESTED***

Ms. Laurie Slaughter
Matthew Schipper, Inc.
340 Commerce Dr
Crystal Lake, IL 60014
Laurie@emsforevents.com

| Re: | Insured: | Matthew Schipper, Inc. |
|---|---|---|
| | Claimant: | Estate of Scott D. Elias |
| | Matter: | *Elias v. BKS Solutions, et al.* |
| | Policy No.: | L89850231AHL |
| | Policy Period: | April 20, 2023 to November 1, 2023 (policy canceled)[1] |
| | StarStone Claim No.: | LI2504015401 |

Dear Ms. Slaughter:

As you know, StarStone Specialty Insurance Company ("StarStone") issued the Healthcare Liability Follow Form Excess Insurance Policy, number L89850231AHL, to Matthew Schipper, Inc. ("MSI") as the **Named Insured**[2] for the period of April 20, 2023 to April 20, 2024 ("StarStone Excess Policy"). The StarStone Excess Policy, subject to its own terms, conditions, limitations, and endorsements, follows form to the **Followed Policy**, which is defined as the Professional Liability Policy, number HN049259, issued to MSI by National Fire & Marine Insurance Company ("NFMIC") for the same period. At the outset, by endorsement, the **Followed Policy** schedules Event Medical Solutions as a trade, fictitious or business (d/b/a) name for which the **Followed Policy** affords the same coverage as to the **named insured**. Both policies were cancelled on November 1, 2023.

StarStone again acknowledges receipt of a Fourth Amended Complaint filed April 11, 2025 in the lawsuit captioned *Christina S. Elias, Independent Executor of the Estate of Scott D. Elias, Deceased v. BKS Solutions, Inc. d/b/a Event Medical Solutions, Inc., an Illinois corporation, et al*, Case No. 2023L006849, filed in the Circuit Court of Cook County, Illinois ("Lawsuit"). StarStone directs this letter to you in your capacity as MSI's contact for coverage-related communications including StarStone's preliminary coverage position with respect to the Lawsuit provided below. However, if this or any other coverage-related communication should be directed to any other party, please let us know.

---

[1] As amended by Endorsement No. 2 to the StarStone Excess Policy.
[2] Words in bold are defined terms as set forth in the StarStone Excess Policy and NFMIC Policy. We refer you to the actual Policies for their complete terms and conditions.

**Cozen O'Connor**

Ms. Laurie Slaughter
June 2, 2025
Page 2

Regardless of any coverage issues, we have no indication that the **Underlying Policy** has been exhausted by the payment of the **Underlying Limit**. For this reason, the StarStone Excess Policy is not currently implicated by this matter. Further, it is our understanding from the April 16, 2025 email from MSI's insurance agent enclosing a copy of the Fourth Amended Complaint that this matter was submitted for notice purposes only. Nonetheless, StarStone takes this opportunity to raise certain terms, provisions, limitations and conditions of the StarStone Excess Policy and the NFMIC Policy, to which it follows form, (collectively, "Policies"), that may preclude or otherwise limit any coverage for this matter in the future.

## I.     RELEVANT BACKGROUND

We recognize that the allegations made in the FAC are unsubstantiated contentions at this time. Nothing in this letter is intended to suggest or imply that the allegations have any legal or factual merit. We are simply reciting certain allegations to give context to the coverage evaluation.

On July 11, 2023, Plaintiff Christina Elias, Special Administrator of the Estate of Scott Elias ("Plaintiff") commenced the Lawsuit by filing the Original Complaint against Jam Productions, Ltd. ("Jam") and Riviera Entertainment Properties, LLC d/b/a The Riviera Theater ("Riviera") (collectively, "Defendants"). At that time, Plaintiff asserted claims for premises liability and negligence against both Defendants in connection with injuries Scott Elias ("Decedent") sustained at a concert in the venue owned and operated by the Defendants on June 21, 2023. Plaintiff alleged that the Decedent was overcome by heat, passed out and fell to the floor resulting in a cervical fracture at C4 and was ultimately removed from the premises on a medical transport chair by "medical staff" retained or employed by Jam and/or Riviera. The Decedent ultimately died of his injuries on July 1, 2023 ("Incident"). Although EMS was not yet named as a defendant in the Lawsuit, MSI's insurance agent provided notice of the Lawsuit to NFMIC on July 25, 2023.

Ultimately, Plaintiff filed an Amended Complaint on June 6, 2024 which first named BKS Solutions, Inc. d/b/a Event Medical Solutions, Inc. ("EMS")[3] as a Defendant. The Amended Complaint was served on EMS on June 20, 2024. In the Amended Complaint, Plaintiff alleged that EMS provided emergency medical services on the date of the Incident including through the EMTs that treated the Decedent as its employees or agents. Plaintiff thus asserted two counts against EMS including for wrongful death (Count I) and survival (Count II).

On April 11, 2025, Plaintiff filed the Fourth Amended Complaint, which appears to be the operative complaint in the Lawsuit as of this writing. In the Fourth Amended Complaint, Plaintiff added similar claims against the City of Chicago and asserted that both Chicago Fire Department ("CFD") and EMS knew or should have known that a cervical collar was required to restrict the motion of Decedent's cervical spine. However, CFD and EMS failed to perform an equipment check prior to the concert to ensure that they had the proper medical supplies, including a cervical collar, to treat concertgoers, including Decedent. Further, Plaintiff asserts that the EMTs employed by EMS and/or paramedics employed by CFD demonstrated utter indifference to and/or conscious disregard for the Decedent's welfare by proceeding to move him through the crowd without a cervical collar to immobilize his spine. As direct and proximate result of the foregoing conduct, Decedent allegedly suffered injuries resulting in his death.

On April 16, 2025, MSI's insurance agent first provided notice of the Lawsuit to StarStone. On April 18, 2025, StarStone acknowledged notice. Notably, StarStone received notice of the Lawsuit 631 days after MSI provided notice to NFMIC and 300 days after EMS was first served with the Lawsuit.

---

[3] Event Medical Solutions is listed as a Trade, Fictitious or Business (D/B/A) name of Matthew Schipper, Inc on the NMFIC policy. According to public records, BKS Solutions, Inc. is formerly known as Matthew Schipper, Inc. but changed names effective as of December 6, 2023.

**Cozen O'Connor**

Ms. Laurie Slaughter
June 2, 2025
Page 3

## II. POLICY PROVISIONS

### A. StarStone Excess Policy

StarStone issued Healthcare Liability Follow Form Excess Insurance Policy, number L89850231AHL, to MSI for the period April 20, 2023 to November 1, 2023.[4]  The StarStone Excess Policy provides a limit of liability of $5 million per **Claim** and in the aggregate, inclusive of **Defense Costs**.  The StarStone Excess Policy, subject to its own terms, conditions, limitations, and endorsements, follows form to the **Followed Policy**, which is defined as the NFMIC Policy, which includes professional liability and general liability sections, among other coverage parts.  The NFMIC Policy provides a $3 million limit of liability per **Claim** and $3 million in the aggregate for both professional liability and general liability.

The StarStone Excess Policy provides:

### I. INSURING AGREEMENT

The **Insurer** shall pay those sums that the **Insured** becomes legally obligated to pay as **Loss** in excess of the **Underlying Limit** as a result of a covered **Claim,** provided that the **Followed Policy** also applies or would apply but for the exhaustion of the **Underlying Limit**. This Policy, except as stated herein, is subject to all of the terms, conditions, limitations, and exclusions contained in or applicable to the **Followed Policy** as of the inception date of this Policy. In no event shall this Policy grant broader coverage than would be provided by the most restrictive applicable **Underlying Policy**.

The StarStone Excess Policy contains the following relevant provision:

### II. DEFENSE, INVESTIGATION AND SETTLEMENT OF CLAIMS

A.  The **Insurer** may, at its sole discretion, associate in the investigation, defense and/or settlement of any **Claim** or potential **Claim** reported to the **Insurer** even if the **Underlying Limit** has not been exhausted. The **Insureds** shall give the **Insurer** all information and cooperation as the **Insurer** may reasonably require.

B.  The **Insurer** shall have the duty to defend the **Insured** against covered **Claims** only following the exhaustion of the **Underlying Limit** and any other applicable insurance, provided that the **Followed Policy** would apply but for the exhaustion of the **Underlying Limit. Defense Costs** shall reduce the Limits of Liability of this Policy. The duty to defend ends when the applicable Limit(s) of Liability of this Policy are exhausted by payment of **Loss**.

C.  The **Insurer** shall have no obligation under this Policy with respect to any **Claim** settled without the **Insurer's** written consent.

The StarStone Excess Policy contains the following relevant definitions:

B.  **Claim** shall have the meaning as assigned to that term or the equivalent term in the **Followed Policy.** If not so defined, **Claim** means:

1.  a written demand for monetary damages or services against any **Insured;**

---

[4] As amended by Endorsement No. 2 to the StarStone Excess Policy.

**Cozen O'Connor**

Ms. Laurie Slaughter
June 2, 2025
Page 4

2. a civil proceeding commenced by the service of a complaint or similar proceeding against any **Insured;** or

3. an arbitration, mediation or alternative dispute resolution proceeding against any **Insured**.

Multiple **Claims** arising from the same or a series of related or repeated acts, errors, omissions, or occurrences, or from any continuing acts, errors, omissions, or occurrences shall be considered a single **Claim** for the purposes of this Policy, irrespective of the number of claimants or **Insureds** involved.

All such **Claims** shall be deemed to have been made at the time of the first such **Claim.**

C. **Damages** shall have the meaning as assigned to that term or the equivalent term in the **Followed Policy.** If not so defined, **Damages** means the monetary portion of any judgment or award, including pre-judgment and post-judgment interest, or any settlement, provided always that **Damages** shall not include:

1. taxes, civil fines, criminal fines, sanctions, restitution or penalties imposed by law, statute, regulation, a court or court rule;

2. notwithstanding any terms or conditions of this Policy, **Damages** shall not include punitive or exemplary damages, or the multiplied portion of multiplied damages;[5]

3. any amounts deemed uninsurable under the law pursuant to which this Policy may be construed;

4. the cost to comply with any form of injunctive or other non-monetary or declaratory relief; or

5. any amounts payable by any **Insured** for, or for the return of, fees, commissions, profits or charges for services or consideration.

**\*\*\*\*\*\*\*\*\*\***

E. **Followed Policy** means the Governing Excess policy specified in Item 4.a. of the Declarations. If no such Governing Excess policy is specified, then **Followed Policy** shall mean the applicable **Underlying Policy** set forth in Item 4.b. of the Declarations.

**\*\*\*\*\*\*\*\*\*\***

L. **Underlying Limit** means an amount equal to the total limits of liability of all applicable **Underlying Policies,** plus the retention, deductible, and/or coinsurance, if any, applicable under such **Underlying Policies. Underlying Limit** shall not include **Defense Costs** except with respect to those **Underlying Policies** that specify that the limits of liability are reduced by **Defense Costs.**

M. **Underlying Policies** means the Policies listed in Item 4 of the Declarations.

The StarStone Excess Policy includes an Endorsement setting forth the Amended Reporting and Notice Requirements, which provides:

It is agreed that:

1. Paragraph 1 of Section VI. Conditions, B. Reporting and Notice Requirements of this Policy is replaced by the addition of the following:

---

[5] As amended by the Amended Definition of Damages to Exclude Punitive Damages Endorsement.

**Cozen O'Connor**

Ms. Laurie Slaughter
June 2, 2025
Page 5

1. As a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall give written notice to the **Insurer**:

   a. as soon as practicable of any occurrence, offense, **Claim** or suit reasonably expected to involve this Policy; but

   b. when the **Followed Policy** provides coverage on a claims-made basis, in the event of any **Claim**:

      1. brought or maintained as a **Class Action;** or
      2. involving any of the following:
         i. unexpected death;
         ii. fall resulting in fracture or cranial bleed;
         iii. skin breakdown, including but not limited to decubiti
         iv. elopement;
         v. infectious disease; or
         vi. any sentinel event,

   notice must be provided as soon as practicable; but in no event later than 30 days after the end of the **Policy Period.**

The StarStone Excess Policy includes the following condition:

## VI. CONDITIONS

### A. UNDERLYING INSURANCE

1. This Policy shall apply to covered **Loss** only after exhaustion of the **Underlying Policies** by the payment of the **Underlying Limit.** Following such exhaustion, the **Insurer** shall be liable to pay only covered **Loss** in excess of the **Underlying Limit.**

2. This Policy shall apply only after the **Underlying Limit** is paid as described in paragraph A.1. above and shall not apply for any other reason including but not limited to uncollectability, in whole or in part, of any **Underlying Policy.** The risk of such uncollectability, whether because of financial impairment or insolvency or for any other reason, is expressly retained by the **Insureds** and is not in any way or under any circumstances insured or assumed by the **Insurer.**

3. If the **Followed Policy** affords coverage on a claims-made basis, then this insurance shall apply on a claims-made basis; provided however, no coverage shall be available under this Policy for **Loss** based upon or arising out of any act, error, omission, or event:

   a. commencing, in whole or in part, before the applicable Retroactive Date set forth in Item 3.c. of the Declarations; or
   b. occurring prior to the **Policy Period** if any **Responsible Insured,** on or before the effective date of the **Policy Period,** knew or could have reasonably foreseen that such act, error, omission or event might reasonably be expected to be the basis of a **Claim.**

**Cozen O'Connor**

Ms. Laurie Slaughter
June 2, 2025
Page 6

        If the **Followed Policy** affords coverage on an occurrence basis, then this Policy shall apply on an occurrence basis.

4.     Any and all **Underlying Policies** shall be maintained in full force and effect. In the event of failure to fully maintain any **Underlying Policy,** or the failure to meet all of the conditions, representations and warranties of an **Underlying Policy** resulting in the unavailability of such **Underlying Policy,** the **Insurer** shall not be liable under this Policy to a greater extent than it would have been had such **Underlying Policy** been fully maintained.

**\*\*\*\*\*\*\*\*\*\***

**B.**    **NFMIC Policy**

NFMIC issued Medical Facility Professional Liability Policy, number MFP-00880-20-01, to MSI effective April 20, 2023 to November 1, 2023.[6] The NFMIC Policy provides coverage for, among other coverage parts, professional liability and general liability. The NFMIC Policy provides limits of $3 million Each Occurrence Limit and a $3 million General Aggregate Limit for the GL and PL Coverage Parts. The NFMIC Policy provides a Schedule of Trade, Fictitious and/or Business Names which includes MSI as the **named insured** and Event Medical Solutions is listed as a Trade, Fictitious or Business (D/B/A) name. The NFMIC policy has a Retroactive Date of April 20, 2022. The NFMIC Policy does not provide an extended reporting period.

The NFMIC Policy provides coverage as follows:

**I. INSURING CLAUSES**

    A.   PROFESSIONAL LIABILITY

        1.   Claims-Made and Reported

            If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

        a.   The **company** will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **health care event** that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the **loss** or **claims expense** must arise from:

        (1)  a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or

        (2)  a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**.

        b.    All **claims** and **potential claims** arising out of, or in connection with, a **health care event** will be deemed to have been first made on the date that the first of those **claims** is made

---

[6] As amended by NFMIC Policy Endorsement No. 9.

**Cozen O'Connor**

Ms. Laurie Slaughter
June 2, 2025
Page 7

against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier. Only the policy in effect when the first such **claim** is made and reported to the **company**, or the first such **potential claim** is discovered and reported to the **company**, whichever is earlier, will apply to the **health care event**, no matter when any subsequent **claims** are made or reported, or **potential claims** are discovered and reported. If, prior to the effective date of this policy, the first such **claim** is made, or the first such **potential claim** is discovered, this policy will not apply to any subsequent **claim** or **potential claim** made during this **policy period** or any **extended reporting period**.[7]

**********

## III.    COVERAGE POSITION

We recognize that the allegations of the Lawsuit are unsubstantiated contentions at this time. Nothing in this letter is intended to suggest or imply that the allegations have any legal or factual merit. Nevertheless, we cite certain of the allegations in connection with the applicable provisions of the Policies for reference and context.

Pursuant to the StarStone Excess Policy, StarStone agreed to pay those sums that the **Insured** becomes legally obligated to pay as **Loss** in excess of the **Underlying Limit** as a result of a covered **Claim**, provided that the **Followed Policy** (here, the NFMIC Policy) also applies or would apply but for the exhaustion of the **Underlying Limit**. As noted above, we have no indication that there has been exhaustion of the **Underlying Policy** by the payment of the **Underlying Limit**. Therefore, the StarStone Excess Policy is not currently implicated by the Incident or the Lawsuit regardless of any other coverage issues. Moreover, StarStone does not have copies of any coverage position letter issued by NFMIC with respect to the original notice of potential claim provided on July 25, 2023 or the subsequent complaints filed in the Lawsuit. Please forward any coverage position letter(s) issued by NFMIC at your earliest convenience together with a copy of the original notice provided to NFMIC on July 25, 2023.

As stated above, StarStone nevertheless takes this opportunity to raise certain terms, provisions, and conditions which may ultimately preclude or otherwise limit any coverage under the StarStone Excess Policy. The StarStone Excess Policy, except as stated within, is subject to all of the terms, conditions, limitations, and exclusions contained in or applicable to the **Followed Policy** as of the inception date of the StarStone Excess Policy. The **Followed Policy**'s Professional Liability Coverage Part ("PL Section") provides claims-made-and-reported coverage. More specifically, the PL Section Insuring Agreement provides NFMIC will pay on behalf of any **insured** all **loss** and **claims expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations. However, the Insuring Agreement further provides to be covered, the loss or claims expense must arise from (1) a **claim** that was first made against, and received by, an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within any applicable **extended reporting period**; or (2) a **potential claim** that was first known about or discovered by an **insured** during the **policy period**, and reported to the **company**, in writing, during the **policy period** or within the automatic limited **extended reporting period**. In addition, the PL Section states all **claims** and **potential claims** arising out of, or in connection with, a **health care event** will be deemed to have been first made on the date that the first of those **claims** is made against any **insured**, or the date the first of such **potential claims** is discovered by an **authorized insured**, whichever date is earlier.

The NFMIC Policy defines a **claim** as an express, written demand upon an insured for money or services as compensation for damages, including a suit which is further defined as a civil proceeding in which damages to which this insurance applies are alleged. **Potential claim** means an event that an **authorized insured** knows or reasonably should know is likely to result in a **claim**. **Health care event** to mean any **event** in the rendering of, or failure to render, **professional services** that results in injury to a **patient** or to a **resident**. All injuries to a **patient** or to a

---

[7] The General Liability Coverage Part would not be implicated because the circumstances involve a **claim or potential claim** arising out of, or in connection with, a **health care event,** which is excluded by Policy Exclusion A.(2).

**Cozen O'Connor**

Ms. Laurie Slaughter
June 2, 2025
Page 8

**resident** arising out of, or in connection with, the same or related acts or omissions, including a series of related acts or omissions, in furnishing **professional services** to a **patient** or to a **resident**, whether by one or more **insureds** or other persons, shall be considered one **health care event**.

Based on the limited information provided, the Incident and/or Lawsuit appears to have been first reported by MSI to NFMIC as a **potential claim** on July 25, 2023. Thus, under the express language of the PL Section Insuring Agreement, this matter appears to involve **claims** and **potential claims** arising out of, or in connection with, a **health care event** deemed first made on July 25, 2023. However, as noted above, StarStone did not receive notice of this matter until April 16, 2025.

Pursuant to the Amended Reporting and Notice Requirements Endorsement, the StarStone Excess Policy requires, *as a condition precedent to the coverage*, that the **Insureds** give written notice to StarStone as soon as practicable of any occurrence, offense, **Claim** or suit reasonably expected to involve the StarStone Excess Policy but when the **Followed Policy** provides coverage on a claims-made basis, in the event of any **Claim** involving unexpected death, such as the claims asserted in the Lawsuit, notice must be provided as soon as practicable; *but in no event later than 30 days after the end of the **Policy Period*** (emphasis added). As noted above, the PL Section provides coverage on a claims-made basis and the Lawsuit specifically alleges that the Decedent died as a result of his injuries on July 1, 2023. Accordingly, StarStone reserves its rights, including the right to disclaim any coverage based on the failure to satisfy the conditions precedent to coverage under the StarStone Excess Policy.

Additionally, other terms and provisions of the Policies may further preclude or otherwise limit any coverage for this matter, including, but not limited to, the StarStone Excess Policy's definition of **Damages.** In particular, the StarStone Excess Policy plainly states that **Damages** does not include any taxes, civil fines, criminal fines, sanctions, restitution or penalties imposed by law, statute, regulation, a court or court rule; any amounts deemed uninsurable by law; the cost to comply with any form of injunctive or other non-monetary or declaratory relief; or any amounts payable by any **Insured** for, or for the return of, fees, commissions, profits or charges for services or consideration or any punitive or exemplary damages, or the multiplied portion of multiplied damages. In light of the allegations of utter indifference and/or conscious disregard for the Decedent's welfare, StarStone further reserves its rights with respect to any and all amounts sought which do not constitute **Damages** as defined by the StarStone Excess Policy.

**IV.   CONCLUSION**

Regardless of any coverage issues, we have no indication that the **Underlying Policy** has been exhausted by the payment of the **Underlying Limit**. For this reason, the StarStone Excess Policy is not currently implicated by the Lawsuit. At this time, StarStone does not have copies of any coverage position letter(s) issued by NFMIC or the original notice submitted on July 25, 2023 via the insured's insurance agent. Please promptly forward same at your earliest convenience. Other terms and provisions of the Policies, may preclude or otherwise limit coverage for this matter, as set forth above. StarStone reserves the right to supplement and revise its coverage position upon receipt and evaluation of any additional information.

StarStone's coverage position is not intended in any way to be exhaustive or exclusive, and StarStone expressly reserves all of its rights under the StarStone Excess Policy, the NFMIC Policy, and at law including but not limited to the right to raise additional defenses, terms and conditions to coverage as appropriate. The failure to cite other language of the Policies at this time does not preclude StarStone from raising other defenses in the future should the situation so warrant. Nothing in this or any other correspondence or communication shall serve to waive any of StarStone's rights under the Policies. StarStone acknowledges that MSI's and EMS's rights are likewise reserved.

**Cozen O'Connor**

Ms. Laurie Slaughter
June 2, 2025
Page 9

Part 919 of the Rules of the Illinois Department of Insurance requires that our company advise you that, if you wish to take this matter up with the Illinois Department of Insurance, it maintains a Consumer Division in Chicago at 122 S. Michigan Ave., 19th Floor, Chicago, Illinois 60603 and in Springfield at 320 West Washington Street, Springfield, Illinois 62767.

We look forward to receipt of the information requested above including the coverage position letter(s) issued by NFMIC and a copy of the original notice provided to NFMIC on July 25, 2023. In the interim, if you have any questions concerning the foregoing or any additional information you wish us to consider, please do not hesitate to contact us.

Very truly yours,

Gary L. Gassman

cc:     Travis Warriner (travis.warriner@corespecialty.com)
        Shirley Balk (balks@danielandhenry.com)
        Michael J. Weiss (mjweiss@cozen.com)

# EXHIBIT C



October 8, 2025

Gary L. Gassman

Direct Phone   312-474-7994
Direct Fax   312-706-9756
ggassman@cozen.com

***VIA EMAIL, US MAIL & CERTIFIED MAIL –***
***RETURN RECEIPT REQUESTED***

Mr. Karl Kuester
Matthew Schipper, Inc.
340 Commerce Dr
Crystal Lake, IL 60014
Karl@emsforevents.com

| | | |
|---|---|---|
| Re: | Insured: | Matthew Schipper, Inc. |
| | Claimant: | Estate of Scott D. Elias |
| | Matter: | *Elias v. BKS Solutions, et al.* |
| | Policy No.: | L89850231AHL |
| | Policy Period: | April 20, 2023 to November 1, 2023 (policy canceled)[1] |
| | StarStone Claim No.: | LI2504015401 |
| | Cozen File No.: | 00639342 |

Dear Mr. Kuester:

As you know, we represent StarStone Specialty Insurance Company ("StarStone") with respect to Healthcare Liability Follow Form Excess Insurance Policy No. L89850231AHL ("StarStone Excess Policy") issued to Matthew Schipper, Inc. ("MSI") in connection with the Lawsuit captioned *Christina S. Elias, Independent Executor of the Estate of Scott D. Elias, Deceased v. BKS Solutions, Inc. d/b/a Event Medical Solutions, Inc., an Illinois corporation, et al*, Case No. 2023L006849, filed in the Circuit Court of Cook County, Illinois ("Lawsuit"). This letter supplements and replaces StarStone's June 2, 2025 position regarding coverage under the StarStone Excess Policy for the Lawsuit for MSI. We are directing this letter to you as MSI's contact for coverage related communications. However, if this or any other coverage-related communication should be directed to any other person, please let us know. In addition, please note that our discussion of the allegations in the Lawsuit in this letter should not be construed as any indication that it is StarStone's position that such allegations have been substantiated.

The StarStone Excess Policy, subject to its own terms, conditions, limitations, and endorsements, follows form to the **Followed Policy**, which is identified the **Underlying Policy** set forth in Item 4.b of the Declarations as Professional Liability Policy No. HN049259 ("Primary Policy") issued by National Fire & Marine Insurance Company ("NFMIC") to MSI. As discussed below, regardless of any coverage issues, we have no indication that the **Underlying Policy** has been exhausted by the payment of the **Underlying Limit**. For this reason, the StarStone Excess Policy is not currently implicated by the Lawsuit. Nonetheless,

---

[1] As amended by Endorsement No. 2 to the StarStone Excess Policy.

**Cozen O'Connor**

Mr. Karl Kuester
October 8, 2025
Page 2

based on our review of all information currently available, including but not limited to, the Lawsuit's allegations, the Primary Policy, and StarStone Excess Policy (collectively, "Policies"), the StarStone Excess Policy is not potentially implicated by the Lawsuit, for the reasons set forth below. Notwithstanding StarStone's coverage position, StarStone will attend the October 22, 2025 mediation in good faith.

## I.      RELEVANT BACKGROUND

On July 11, 2023, Plaintiff Christina Elias, Special Administrator of the Estate of Scott Elias ("Plaintiff") commenced the Lawsuit by filing the Original Complaint against Jam Productions, Ltd. ("Jam") and Riviera Entertainment Properties, LLC d/b/a The Riviera Theater ("Riviera") (collectively, "Defendants"). At that time, Plaintiff asserted claims for premises liability and negligence against both Defendants in connection with injuries Scott Elias ("Decedent") sustained at a concert in the venue owned and operated by the Defendants on June 21, 2023. Plaintiff alleged that the Decedent was overcome by heat, passed out and fell to the floor resulting in a cervical fracture at C4 and was ultimately removed from the premises on a medical transport chair by "medical staff" retained or employed by Jam and/or Riviera. The Decedent ultimately died of his injuries on July 1, 2023 ("Incident"). Although BKS Solutions, Inc. d/b/a Event Medical Solutions, Inc. ("EMS") was not yet named as a defendant in the Lawsuit, MSI's insurance agent provided notice of the Lawsuit to NFMIC on July 25, 2023. NFMIC acknowledged notice of the Lawsuit on August 10, 2023.

On February 22, 2024, EMS received a records subpoena in connection with the Lawsuit and sent a copy to its insurance agent. On June 6, 2025, Plaintiff filed an Amended Complaint which named EMS as a Defendant. The Amended Complaint was served on EMS on June 20, 2024. MSI provided NFMIC with notice of the Amended Complaint. On July 3, 2024, NFMIC acknowledged notice of the Amended Complaint. The Amended Complaint alleges that EMS provided emergency medical services on the date of the Incident including through the EMTs that treated the Decedent as its employees or agents. Plaintiff thus asserted two counts against EMS including for wrongful death (Count I) and survival (Count II). On April 11, 2025, Plaintiff filed a Fourth Amended Complaint, which is the operative complaint in the Lawsuit.

Ther FAC added similar claims against the City of Chicago and asserted that both Chicago Fire Department ("CFD") and EMS knew or should have known that a cervical collar was required to restrict the motion of Decedent's cervical spine. However, CFD and EMS failed to perform an equipment check prior to the concert to ensure that they had the proper medical supplies, including a cervical collar, to treat concertgoers, including Decedent. Further, Plaintiff asserts that the EMTs employed by EMS and/or paramedics employed by CFD demonstrated utter indifference to and/or conscious disregard for the Decedent's welfare by proceeding to move him through the crowd without a cervical collar to immobilize his spine. As direct and proximate result of the foregoing conduct, Decedent allegedly suffered injuries resulting in his death.

On April 16, 2025, MSI's insurance agent first provided notice of the Lawsuit to StarStone: 665 days after Decedent fell at a concert in which EMS was providing emergency medical services; 655 days after Decedent died; 632 days after EMS knew or reasonably should have known that Decedent died after suffering a fall at a concert in which EMS was providing emergency medical services; 615 days after EMS reported and NFMIC acknowledged receipt of the Underlying Action; 532 days after the termination of the StarStone Excess Policy; 502 days after that latest date EMS could have reported a **Claim** involving an unexpected death or sentinel event; 419 days after EMS received a records subpoena in the Underlying Action; and 314 days after EMS was added to the Underlying Action as a direct defendant. On April 18, 2025, StarStone acknowledged notice.

**Cozen O'Connor**

Mr. Karl Kuester
October 8, 2025
Page 3

## II.    POLICY PROVISIONS

### A.    <u>StarStone Excess Policy</u>

StarStone issued the StarStone Excess Policy to MSI for the period April 20, 2023 to November 1, 2023.[2] The StarStone Excess Policy provides a limit of liability of $5 million per **Claim** and in the aggregate, inclusive of **Defense Costs**.

The StarStone Excess Policy's insuring agreement provides as follows:

> ### I.    INSURING AGREEMENT
>
> The **Insurer** shall pay those sums that the **Insured** becomes legally obligated to pay as **Loss** in excess of the **Underlying Limit** as a result of a covered **Claim,** provided that the **Followed Policy** also applies or would apply but for the exhaustion of the **Underlying Limit**. This Policy, except as stated herein, is subject to all of the terms, conditions, limitations, and exclusions contained in or applicable to the **Followed Policy** as of the inception date of this Policy. In no event shall this Policy grant broader coverage than would be provided by the most restrictive applicable **Underlying Policy**.

The StarStone Excess Policy contains the following relevant definitions:

> B.  **Claim** shall have the meaning as assigned to that term or the equivalent term in the **Followed Policy**. If not so defined, **Claim** means:
>
> 1.  a written demand for monetary damages or services against any **Insured**;
>
> 2.  a civil proceeding commenced by the service of a complaint or similar proceeding against any **Insured**; or
>
> 3.  an arbitration, mediation or alternative dispute resolution proceeding against any **Insured**.
>
> E.  **Followed Policy** means the Governing Excess policy specified in Item 4.a. of the Declarations. If no such Governing Excess policy is specified, then **Followed Policy** shall mean the applicable **Underlying Policy** set forth in Item 4.b. of the Declarations.
>
> F.  **Insured** means the **Named Insured** and any person or organization qualifying as an insured under the **Followed Policy**.
>
> L.  **Underlying Limit** means an amount equal to the total limits of liability of all applicable **Underlying Policies**, plus the retention, deductible, and/or coinsurance, if any, applicable under such **Underlying Policies**. **Underlying Limit** shall not include **Defense Costs** except with respect to those **Underlying Policies** that specify that the limits of liability are reduced by **Defense Costs**.
>
> M.  **Underlying Policies** means the Policies listed in Item 4 of the Declarations.

---

[2] As amended by Endorsement No. 2 to the StarStone Excess Policy.

**Cozen O'Connor**

Mr. Karl Kuester
October 8, 2025
Page 4

The StarStone Excess Policy includes the following relevant conditions:

    **A. UNDERLYING INSURANCE**

*    *    *

    3. If the **Followed Policy** affords coverage on a claims-made basis, then this insurance shall apply on a claims-made basis; provided however, no coverage shall be available under this Policy for **Loss** based upon or arising out of any act, error, omission, or event:

        a. commencing, in whole or in part, before the applicable Retroactive Date set forth in Item 3.c. of the Declarations; or

        b. occurring prior to the **Policy Period** if any **Responsible Insured**, on or before the effective date of the **Policy Period**, knew or could have reasonably foreseen that such act, error, omission or event might reasonably be expected to be the basis of a **Claim**.

    If the **Followed Policy** affords coverage on an occurrence basis, then this Policy shall apply on an occurrence basis

The StarStone Excess Policy's Amened Reporting and Notice Requirements Endorsement provides, in relevant part, as follows:

    1. As a condition precedent to the obligations of the **Insurer** under this Policy, the **Insureds** shall give written notice to the **Insurer:**

        a. as soon as practicable of any occurrence, offense, **Claim** or suit reasonably expected to involve this Policy; but

        b. when the **Followed Policy** provides coverage on a claims-made basis, in the event of any **Claim**:
          1. brought or maintained as a **Class Action**; or
          2. involving any of the following:
            i. unexpected death;
            ii. fall resulting in fracture or cranial bleed;
            iii. skin breakdown, including but not limited to decubiti
            iv. elopement;
            v. infectious disease; or
            vi. any sentinel event,

    notice must be provided as soon as practicable; but in no event later than 30 days after the end of the **Policy Period.**

**Cozen O'Connor**

Mr. Karl Kuester
October 8, 2025
Page 5

B. **Primary Policy**

NFMIC issued the Primary Policy to MSI for the period of April 20, 2023 to November 1, 2023.[3] The Primary Policy provides, in relevant part, limits of $3 million per claim and $3 million limit in the aggregate, under the Claims Made Professional Liability coverage part ("PL Section"); limits of $3 million per occurrence and $3 million limit in the aggregate under General Liability coverage part ("GL Section"). Based on the Lawsuit's allegations, only the Primary Policy's PL Section is applicable and addressed below.

The Primary Policy's PL Section's Insuring Agreement provides as follows:

A. PROFESSIONAL LIABILITY

1. <u>Claims-Made and Reported</u>

If "Claims-Made and Reported" is shown on the Declarations with respect to this Coverage Part, the following provisions apply:

a. The **Company** will pay on behalf of any **Insured** all **Loss** and **Claims Expense**, subject to any applicable Deductible or Self-Insured Retention, and up to the Limits of Liability shown on the Declarations with respect to this Coverage Part, arising from a **Health Care Event** that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, to be covered under this policy, the **Loss** or **Claims Expense** must arise from:

(1) a **Claim** that was first made against, and received by, an **Insured** during the **Policy Period**, and reported to the **Company**, in writing, during the **Policy Period** or within any applicable **Extended Reporting Period**; or

(2) a **Potential Claim** that was first known about or discovered by an **Insured** during the **Policy Period**, and reported to the **Company**, in writing, during the **Policy Period** or within the automatic limited **Extended Reporting Period**.

b. All **Claims** and **Potential Claims** arising out of, or in connection with, a **Health Care Event** will be deemed to have been first made on the date that the first of those **Claims** is made against any **Insured**, or the date the first of such **Potential Claims** is discovered by an **Authorized Insured**, whichever date is earlier. Only the policy in effect when the first such **Claim** is made and reported to the **Company**, or the first such **Potential Claim** is discovered and reported to the **Company**, whichever is earlier, will apply to the **Health Care Event**, no matter when any subsequent **Claims** are made or reported, or **Potential Claims** are discovered and reported. If, prior to the effective date of this policy, the first such **Claim** is made, or the first such **Potential Claim** is discovered, this policy will not apply to any subsequent **Claim** or **Potential Claim** made during this **Policy Period** or any **Extended Reporting Period**.[4]

---

[3] As amended by NFMIC Policy Endorsement No. 9.
[4] The General Liability Coverage Part would not be implicated because the circumstances involve a **claim or potential claim** arising out of, or in connection with, a **health care event,** which is excluded by Policy Exclusion A.(2).

**Cozen O'Connor**

Mr. Karl Kuester
October 8, 2025
Page 6

## III.    COVERAGE POSITION

As an initial matter, because we have no indication that there has been exhaustion of the **Underlying Policy** by the payment of the **Underlying Limit**, coverage is not currently available for the Lawsuit under the StarStone Excess Policy, regardless of any other coverage issues. At this time, it is StarStone's understanding that NFMIC has not issued any coverage position letters other than their August 10, 2023 and July 3, 2024 acknowledgment letters. However, if NFMIC has issued any additional letters or coverage correspondence, please forward such letters or coverage correspondence at your earliest convenience. Nonetheless, based on the information received to date, including but not limited to, the FAC and the Policies, StarStone has concluded that the StarStone Excess Policy is not potentially implicated by the Lawsuit. StarStone, however, reserves the right to supplement and revise its coverage position upon receipt and evaluation of any additional NFMIC letter(s) and coverage correspondence.

Pursuant to the StarStone Excess Policy, StarStone agreed to pay those sums that the **Insured** becomes legally obligated to pay as **Loss** in excess of the **Underlying Limit** as a result of a covered **Claim**, provided that the **Followed Policy** (here, the Primary Policy) also applies or would apply but for the exhaustion of the **Underlying Limit**. The StarStone Excess Policy, except as stated within, is subject to all of the terms, conditions, limitations, and exclusions contained in or applicable to the **Followed Policy** as of the inception date of the StarStone Excess Policy. The StarStone Excess Policy shall not grant broader coverage than would be provided by the most restrictive applicable **Followed Policy**.

The Primary Policy's PL Section provides that NFMIC will pay on behalf of any **Insured** all **Loss** and **Claims Expense**, subject to any applicable Deductible or Self-Insured Retention and up to the Limits of Liability shown on the Declarations, arising from a **Health Care Event** that took place on or after the applicable Retroactive Date shown on the Declarations. Moreover, the **Loss** or **Claim Expense** must arise from either (1) a **Claim** that was first made against, and received by, an **Insured** during the **Policy Period**, and reported to NFMIC, in writing, during the **Policy Period** or within any applicable **Extended Reporting Period**; or (2) a **Potential Claim** that was first known about or discovered by an **Insured** during the **Policy Period**, and reported to the **Company**, in writing, during the **Policy Period** or within the automatic limited **Extended Reporting Period**.

The Amended Complaint alleges that Decedent was at a concert on June 21, 2023, Decedent fell and suffered injuries to his cervical spine. Decedent died on July 1, 2023. The Primary Policy defines **Potential Claim** to mean an **Event** that an **Authorized Insurer** knows or reasonably should know is likely to result in a **Claim**. On or about July 25, 2023, MSI's insurance agent reported the Lawsuit — a **Potential Claim**. NFMIC acknowledged notice of the **Potential Claim** on August 10, 2023. The Lawsuit did not name EMS. Therefore, it did not constitute a **Claim**, as defined by the Primary Policy and StarStone Excess Policy. The Amended Complaint, which named EMS as a defendant, was filed on June 6, 2024. The Primary Policy defines **Claim** to mean, in relevant part, "an express, written demand upon an **insured** for money or services as compensation for damages, including a suit. As used in this definition, "suit" means a civil proceeding in which damages to which this insurance applies are alleged." The Lawsuit's Amended Complaint constitutes a **Claim** first made on or about June 6, 2024, when EMS was named as a Defendant in the Lawsuit. The Lawsuit, for purposes of the Primary Policy, is treated as if it had been first made during the Primary Policy's **Policy Period** because MSI provided NFMIC with a notice of **Potential Claim** on July 25, 2023. Therefore, the Lawsuit appears to implicate the Primary Policy's PL Section. However, the StarStone Excess Policy is not potentially implicated for the following reasons.

Section VI.A.3. of the StarStone Excess Policy provides, in relevant part, that if the **Followed Policy** affords coverage on a claims-made basis, then the StarStone Excess Policy shall apply on a claims-made basis as

**Cozen O'Connor**

Mr. Karl Kuester
October 8, 2025
Page 7

well. The Primary Policy, which is the **Followed Policy**, provides coverage on a claims-made basis. In that regard, the StarStone Excess Policy also provides coverage on a claims-made basis. As noted above, the Lawsuit constitutes a **Claim** first made on June 6, 2024, which is after the StarStone Excess Policy's **Policy Period**. Therefore, as the **Claim** was not made during the StarStone Excess Policy's **Policy Period**, the StarStone Excess Policy is not potentially implicated and StarStone disclaims coverage for the Lawsuit under the StarStone Excess Policy.

Alternatively, if the Lawsuit is considered a **Claim** first made during the **Policy Period**, MSI failed to comply with a condition precedent to StarStone's obligations under the StarStone Excess Policy as set forth in the StarStone Excess Policy's Amended Reporting and Notice Requirements Endorsement. Condition 1.b.1.2, provides, in relevant part, that when the **Followed Policy** provides coverage on a claims-made basis, in the event of a **Claim** involving unexpected death or any sentinel event, notice must be provided as soon as practicable; but in no event later than 30 days after the **Policy Period**. Assuming *arguendo*, that the Lawsuit constitutes a **Claim** made during the **Policy Period**, MSI was required to provide notice to StarStone no later than December 1, 2023. However, MSI provided notice of the Lawsuit to StarStone on April 16, 2025 – 502 days after the latest date that MSI could have reported a **Claim** made during the **Policy Period** involving an unexpected death or sentinel event.

Moreover, Condition 1.a, provides, in relevant part, as condition precedent to StarStone's obligations under the StarStone Excess Policy, MSI shall give written notice to StarStone as soon as practicable of any occurrence, offense, **Claim** or suit reasonably expected to involve the StarStone Excess Policy. Decedent died on July 1, 2023. EMS knew or reasonably should have known, on July 24, 2023, when it received a copy of the Lawsuit, that the Lawsuit involved an unexpected death and that EMS provided emergency medical services to the Decedent. However, MSI did not provide StarStone with notice of Decedent's death until April 16, 2025 – 665 days after Decedent fell at a concert in which EMS was providing emergency medical services; 655 days after Decedent died; 632 days after EMS knew or reasonably should have known that Decedent died after falling at a concert in which EMS was providing emergency medical services; 615 days after NFMIC acknowledged receipt of the Lawsuit; 532 days after the termination of the StarStone Excess Policy; 419 days after EMS received a records subpoena in the Lawsuit; and 314 days after EMS was added to the Lawsuit as a Defendant. Therefore, MSI failed to satisfy a condition precedent to coverage by not complying with the StarStone Excess Policy's express reporting and notice requirements.

Although the StarStone Excess Policy is not implicated by this matter, StarStone reserves its rights to raise other terms, provisions and exclusions in the Policies that could further limit or preclude coverage for the matter to the extent it was determined that the StarStone Excess Policy was potentially implicated, including, but not limited to the following: Primary Policy PL Exclusion (B) (intentional acts).

## IV.    CONCLUSION

Regardless of any coverage issues, we also have no indication that the **Underlying Policy** has been exhausted by the payment of the **Underlying Limit**. For this reason, the StarStone Excess Policy is not currently implicated by the Accident. As stated above, it is StarStone's understanding that NFMIC has not issued any coverage position letters other than their August 10, 2023 and July 3, 2024 acknowledgment letters. However, if NFMIC has issued any additional letters or coverage correspondence, please forward such letters or coverage correspondence at your earliest convenience. Nonetheless, based on the information received to date, including but not limited to, the Lawsuit and the Policies, the StarStone Excess Policy is not potentially implicated because the Lawsuit constitutes a **Claim** made after the StarStone Excess Policy's **Policy Period**. Moreover, to the extent that the Lawsuit is construed as a **Claim** made during the StarStone Excess Policy's **Policy Period**, MSI failed to satisfy a condition precedent to coverage by not complying

**Cozen O'Connor**

Mr. Karl Kuester
October 8, 2025
Page 8

the StarStone Excess Policy's express reporting and notice requirements. Notwithstanding StarStone's coverage position, StarStone will attend the currently scheduled October 22, 2025 mediation in good faith to assist in amicably resolving this matter.

StarStone's coverage position is not intended in any way to be exhaustive or exclusive, and StarStone expressly reserves all of its rights under the StarStone Excess Policy, the NFMIC Policy, and at law including but not limited to the right to raise additional defenses, terms and conditions to coverage as appropriate. The failure to cite other language of the Policies at this time does not preclude StarStone from raising other defenses in the future should the situation so warrant. StarStone reserves all of its rights and nothing in this or any other correspondence or communication shall serve to waive any of StarStone's rights under the Policies. StarStone acknowledges that MSI's and EMS's rights are likewise reserved.

Part 919 of the Rules of the Illinois Department of Insurance requires that our company advise you that, if you wish to take this matter up with the Illinois Department of Insurance, it maintains a Consumer Division in Chicago at 122 S. Michigan Ave., 19th Floor, Chicago, Illinois 60603 and in Springfield at 320 West Washington Street, Springfield, Illinois 62767.

Please note, on October 8, 2025, StarStone filed the attached Complaint for Declaratory Judgment in the U.S. District Court for the Northern District of Illinois. StarStone would like to avoid the cost of service of summons of the Complaint for Declaratory Judgment. In that regard, we attach a Notice of Lawsuit and Request to Waiver Service of a Summons and a Waiver of the Service of Summons. Please let us know if you agree to waive service of the Complaint for Declaratory Judgment on behalf of EMS.

If you have any questions concerning the foregoing or any additional information you wish us to consider, please do not hesitate to contact us.

Very truly yours,

Gary L. Gassman

Enclosures

cc:     Travis Warriner (travis.warriner@corespecialty.com)
        Shirley Balk (balks@danielandhenry.com)
        Michael J. Weiss (mjweiss@cozen.com)

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| STARSTONE SPECIALTY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 1:2025cv12314 |
| BKS SOLUTIONS, INC. D/B/A EVENT MEDICAL SOLUTIONS F/K/A MATTHEW SCHIPPER INC. D/B/A EVENT MEDICAL SOLUTIONS, and CHRISTINA S. ELIAS, Independent Executor of the Estate of Scott D. Elias, Deceased, | ) ) ) ) ) ) ) | Honorable Judge Manish S Shah |
| Defendants. | ) ) | |

## AFFIDAVIT OF KARL KUESTER

I, Karl Kuester, being duly sworn upon oath, and based by my personal knowledge, declare and states as follows:

1.      I am the Chief Executive Officer of BKS Solutions, Inc. d/b/a Event Medical Solutions f/k/a Matthew Schnipper, Inc. ("EMS"), and I am over the age of 18 years old, and I am authorized to make this Affidavit on behalf of EMS.

2.      I have personal knowledge of the facts stated in this Affidavit and, if called to testify, could and would competently testify to them.

3.      EMS was a defendant in the underlying action: *Estate of Elias v. Matthew Schipper Inc., et al.,* pending in the Circuit Court of Cook County, Illinois and Case No. 23 L 6849 (the "Underlying Action" or the "Elias Action").

1

4.      On October 22, 2025, EMS participated in a mediation, during which StarStone Specialty Insurance Company ("StarStone") and its counsel from Cozen O'Connor attended and participated in the mediation in connection with the the claims against EMS.

5.      EMS understood that StarStone and its counsel from Cozen O'Connor were attending and participating in the mediation.

6.      At no time before, during, or after the mediation of the underlying action did StarStone inform EMS that any payment of contribution toward the settlement of the Elias Action was conditional, or subject to reimbursement from EMS, or made under any reservation of a right whereby StarStone could they seek repayment of same from EMS.

7.      At no time did StarStone or its counsel, from Cozen O'Connor, inform EMS that StarStone intended to pursue EMS for recovery of any settlement funds paid by StarStone in connection with the mediation or settlement of the underlying action.

8.      At the mediation, EMS was never asked to approve, authorize, or agree to indemnify or repay StarStone for the settlement payment made by StarStone.

9.      EMS relied on StarStone's participation in the mediation and settlement discussions as being undertaken on EMS's behalf and in EMS's interest when agreeing to the settlement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2 day of January 2026.

FURTHER AFFIANT SAYETH NAUGHT

Subscribed and Sworn to before me
this 2nd day of January, 2026

_____
Karl Kuester

_____
Notary Public

OFFICIAL SEAL
ADRIENNE MARIE OSTROWSKI
Notary Public, State of Illinois
Commission No. 1011627
My Commission Expires
June 09, 2029

2

